Richard HAUGEN, Petitioner,

v.

John MARSHALL, Warden, Respondent.

Case No. CV 09–8044–ODW (MLG).

United States District Court, C.D. California, Western Division.

Sept. 22, 2010.

Richard Haugen, Carlsbad, CA, pro se.

Amanda Lloyd, CAAG-Office of the Attorney General, San Francisco, CA, for Respondent.

## ORDER ACCEPTING AND ADOPTING FINDINGS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE

OTIS D. WRIGHT, II, District Judge.

Pursuant to 28 U.S.C. § 636(b)(1)(C), the Court has reviewed the Petition for

Writ of Habeas Corpus and all of the records herein, including the Report and Recommendations of the United States Magistrate Judge and has conducted a de novo review of those portions of the Report and Recommendations to which objections were filed.

IT IS ORDERED that (1) the Court accept and adopt the Report and Recommendation, (2) the Petition for Writ of Habeas Corpus is GRANTED, and (3) Judgment be entered granting the petition and ordering that the California Board of Parole Hearings credit Petitioner's parole period for the time he spent in confinement that was in violation of his due process rights.

IT IS FURTHER ORDERED that the Clerk shall serve copies of this Order and the Judgment herein on all parties.

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

MARC L. GOLDMAN, United States Magistrate Judge.

Petitioner Richard Haugen filed this *pro se* petition for writ of habeas corpus, pursuant to 28 U.S.C. § 2254, on November 3, 2009. He alleges that his Fourteenth Amendment due process rights were violated when Governor Arnold Schwarzenegger reversed an October 31, 2006, grant of parole by the California Board of Parole Hearings ("Board").[1] For the reasons discussed below, it is recommended that the petition be granted.

---

**1.** The Court notes that on November 6, 2008, the Board again found Petitioner suitable for parole, a decision which was similarly reversed on review by the Governor. This second reversal gives rise to a second section 2254 petition, *Haugen v. Marshall*, Case No. 10–1768–ODW (MLG), which is currently pending in this Court. On May 13, 2010, Petitioner was released from prison following the Board's third finding of parole suitability. The Governor declined to review this last suitability finding.

## I. Factual and Procedural Background

### A. Underlying Crime [2]

On December 7, 1980, at approximately 7:30 p.m., Petitioner and two accomplices went to a ranch in San Diego County. A plan had been formulated the night before to confront a group of undocumented farm workers with the intention of robbing them. One of the co-defendants had a rifle and Petitioner had a handgun. According to some of the victims, the two carrying the guns were wearing ski masks. The two gunmen pointed their weapons at the victims and demanded their money. Panic ensued and some of the migrant workers tried to run. At this point, gunshots were fired. The victim, Carmelo Tecomulapa, was shot in the buttocks and died at the scene.

One victim stated that, as he fled, he was caught by one of the assailants and struck over the head with the butt of his weapon. The assailant removed the victim's boots and attempted to remove his pants, which the victim believed was for the purpose of searching for money. Another victim stated that a masked assailant threw him against the wall and shouted, "money, money." The assailant pointed the gun at the victim, who gave the assailant his wallet. The assailant removed approximately $80 from the wallet.

The assailants then ran to their car and drove away. At approximately 7:45 p.m., they were stopped by a police officer for speeding. The police officer cited the driver and then took the names of the other two passengers. This citation, as well as the report of a domestic disturbance the following night, eventually led to the arrest of the three suspects.

**2.** The facts of the underlying crime are taken from Petitioner's October 31, 2006 parole hearing. (Lodgment 3.)

### B. Procedural History

On February 2, 1981, Petitioner pleaded guilty in the San Diego County Superior Court to first degree felony murder (Cal. Penal Code § 187). (Pet. at 2.) On March 27, 1981, Petitioner was sentenced to a term of 27 years to life, which included a two year sentence enhancement for personal use of a firearm (Cal. Penal Code §§ 12022.5, 12022(a)). After an appeal to the California Court of Appeal, the trial court struck the gun enhancement and re-sentenced Petitioner to a term of 25 years to life. Petitioner first became eligible for parole in October 1995. (Ex. 5 to Pet. at 1.)

Between 1994 and 2006, the Board appears to have held eight parole consideration hearings, finding Petitioner unsuitable for parole each time. On October 31, 2006, the Board found Petitioner suitable for parole based on: (1) lack of a prior violent criminal record; (2) stable social history; (3) participation in educational, vocational, self-help and substance abuse programs while incarcerated; (4) excellent prison work evaluations; (5) Petitioner's maturation and growth, which reduces the likelihood of recidivism; (6) realistic parole plans; (7) good relations with family members; (8) recent positive institutional behavior, which indicates improved self-control; (9) signs of remorse and acceptance of responsibility for the crime; and (10) positive reports from prison staff. (Ex. B to Pet. at 53–54.)

However, as noted, on March 27, 2007, Governor Arnold Schwarzenegger reversed the Board's suitability finding. (Lodgment 5.) In reversing the suitability finding, the Governor determined that the gravity of the commitment offense alone

was sufficient to conclude that Petitioner would pose an unreasonable public safety risk. The Governor found the crime to be particularly heinous because it involved multiple victims. The Governor further stated that Petitioner had not sufficiently taken responsibility for the commitment crime because there were factual discrepancies between the opinion of the court of appeal and Petitioner's version of events. (Ex. A to Pet. at 2–3.)

Petitioner filed a petition for writ of habeas corpus in the San Diego County Superior Court, which was denied in a written opinion on August 23, 2007. (Exhibit 2 to Pet.) On July 1, 2009, the California Court of Appeal, in a written opinion with one justice dissenting, denied a petition for writ of habeas corpus. (Ex. 9 to Pet.) Petitioner filed a petition for review in the California Supreme Court, which was summarily denied on October 22, 2009. (Ex. 11 to Pet.)

On November 3, 2009, Petitioner filed the current petition for writ of habeas corpus in this Court, challenging the Governor's reversal of the Board's suitability determination. The matter was stayed pending the en banc decision on rehearing of *Hayward v. Marshall*, 512 F.3d 536 (9th Cir.2008), *reh'g en banc granted by* 527 F.3d 797 (9th Cir.2008), *vacated by Hayward v. Marshall*, 603 F.3d 546 (9th Cir. 2010). The Court ordered Petitioner and Respondent to file supplemental briefs addressing the application of *Hayward* to the facts in this case. Those briefs were filed and the matter is now ready for decision.[3]

## II. Applicable Legal Standards

### A. Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"),

federal habeas corpus relief is available to state prisoners who are in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). To establish a right to relief, a petitioner must show that the state's highest court rejected the petitioner's claim on the merits, and that this rejection was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d); *Nunes v. Ramirez–Palmer*, 485 F.3d 432, 437–38 (9th Cir.2007).

■ It is not enough that a federal court conclude "in its independent judgment" that the state court decision is incorrect or erroneous. *Yarborough v. Alvarado*, 541 U.S. 652, 665, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24–25, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam)). "The state court's application of clearly established law must be objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003); *see also Renico v. Lett*, —— U.S. ——, 130 S.Ct. 1855, 1865, 176 L.Ed.2d 678 (2010). AEDPA imposes a " 'highly deferential standard for evaluating state-court rulings' which demands that state-court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455, 125 S.Ct. 847, 160 L.Ed.2d 881 (2005) (quoting *Woodford*, 537 U.S. at 24, 123 S.Ct. 357); *Vasquez v. Kirkland*, 572 F.3d 1029, 1035 (9th Cir.2009).

---

**3.** On December 7, 2009, Petitioner was granted his third parole date by the Board. On May 7, 2010, Governor Schwarzenegger declined to review the Board's decision. On May 13, 2010, Petitioner was released from prison on parole. (Pet'r's Notice of Status Update.)

### B. Application of the AEDPA Standard in Parole Suitability Cases

#### 1. Parole Suitability Under California Law

██ Under California law, prisoners subject to indeterminate life sentences "may serve up to life in prison, but they become eligible for parole consideration after serving minimum terms of confinement." *In re Dannenberg*, 34 Cal.4th 1061, 1078, 23 Cal.Rptr.3d 417, 104 P.3d 783 (2005). "[L]ife inmates' actual confinement periods within the statutory range are decided by [the Board]." *Id.* The Governor may review the Board's parole decisions and is authorized to reverse or modify them, applying the same standards that the Board applies. Cal. Const. art. V, § 8, subd. (b); Cal. Penal Code § 3041.2.

██ The manner in which the Board is to make parole decisions is addressed in Cal. Penal Code § 3041 and implementing regulations. Section 3041's mandatory language establishes that granting parole is the norm: "The [Board] shall set a release date unless it determines that . . . the consideration of the public safety requires a more lengthy period of incarceration for the individual." Cal. Penal Code § 3041(b). The implementing regulations task the Board with determining whether a parole-eligible prisoner would pose a danger to the community if released on parole. "Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judg-ment of the panel [or the Governor] the prisoner will pose an unreasonable risk of danger to society if released from prison." Cal. Code Regs., tit. 15, §§ 2281(a), 2402(a). The Board "must apply detailed standards when evaluating whether an individual is unsuitable for parole on public safety grounds." *Dannenberg*, 34 Cal.4th at 1096 n. 16, 23 Cal.Rptr.3d 417, 104 P.3d 783. The Board and Governor must consider both circumstances tending to show unsuitability as well as suitability in each particular case. *See* Cal. Code Regs., tit. 15, § 2401 ("A parole date shall be set if the prisoner is found suitable for parole under Section 2402(d)," but "[a] parole date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c)."). The Board must consider all pertinent information available associated with the codified factors[4] in making its parole decision. *See Dannenberg*, 34 Cal.4th at 1086, 23 Cal.Rptr.3d 417, 104 P.3d 783.

██ Under California law, "the paramount consideration for both the Board and the Governor" in determining parole suitability is "whether the inmate currently poses a threat to public safety and thus may not be released on parole." *In re Lawrence*, 44 Cal.4th 1181, 1212, 82 Cal.Rptr.3d 169, 190 P.3d 535 (2008). In addition, "the facts relied upon by the Board or the Governor [must] support the ultimate decision that the inmate remains a threat to public safety." *Id.* at 1213, 82 Cal.

---

4. Factors tending to show unsuitability include: (1) the commitment offense, when committed "in an especially heinous, atrocious or cruel manner;" (2) a previous record of violence; (3) an unstable social history; (4) sadistic sexual offenses; (5) a lengthy history of severe mental problems related to the offense; and (6) serious misconduct while incarcerated. Cal. Code Regs., tit. 15, § 2402(c). Conversely, factors tending to show suitability for release include (1) no juvenile record; (2) a stable social history, meaning the inmate has "experienced reasonably stable relationships with others;" (3) signs of remorse; (4) the crime resulted from significant stress in the inmate's life; (5) Battered Woman Syndrome; (6) lack of criminal history; (7) age, if it reduces the likelihood of recidivism; (8) the inmate has made realistic plans for living and working after release; and (9) positive institutional behavior. *Id.* § 2402(d).

Rptr.3d 169, 190 P.3d 535. Accordingly, "the relevant inquiry is whether some evidence supports the *decision* of the Board or the Governor that the inmate constitutes a current threat to public safety." *Id.* (emphasis in original). There must be "some evidence" that the prisoner poses a risk of current dangerousness, not merely "some evidence" of the presence of a factor tending to show unsuitability for parole. *Id.* at 1212, 82 Cal.Rptr.3d 169, 190 P.3d 535.

■ The California Supreme Court has explained that the "some evidence" standard is mandated by the state regulatory, statutory, and constitutional provisions that govern parole decisions in California. *In re Rosenkrantz,* 29 Cal.4th 616, 683, 128 Cal.Rptr.2d 104, 59 P.3d 174 (2002). This is because a state prisoner has a liberty interest in parole under California law in the absence of "some evidence" of current dangerousness. That liberty interest is protected by the Due Process Clause. *Id.* A decision finding current dangerousness "without any 'basis in fact' and not supported by any evidence in the record ... would be arbitrary and capricious and, because it affects a protected liberty interest, would violate established principles of due process of law." *Lawrence,* 44 Cal.4th at 1204–05, 82 Cal.Rptr.3d 169, 190 P.3d 535 (citing *Rosenkrantz,* 29 Cal.4th at 658, 128 Cal.Rptr.2d 104, 59 P.3d 174).

## 2. Scope of Federal Court Review on Habeas Corpus of State Court Decisions Relating to Parole Suitability

The Ninth Circuit, sitting en banc, recently addressed the standards that federal courts must apply on habeas corpus review of California prisoners' due process challenges to unfavorable parole suitability findings. *Hayward,* 603 F.3d at 562. In *Hayward,* the Ninth Circuit held that lower federal courts must decide "whether the California judicial decision approving the Governor's [or the Board's] decision rejecting parole was an 'unreasonable application' of the California 'some evidence' requirement, or was 'based on an unreasonable determination of the facts in light of the evidence.'" *Id.* at 563; *see also Pearson v. Muntz,* 606 F.3d 606, 609 (9th Cir.2010) ("*Hayward* specifically commands federal courts to examine the reasonableness of the state court's application of the California 'some evidence' requirement, as well as the reasonableness of the state court's determination of the facts in light of the evidence.").

Respondent cites Hayward for three propositions that he claims limits this Court's scope of review of state parole suitability determinations under AEDPA. These propositions were raised and explicitly rejected in *Pearson* and will be rejected here too. *See Pearson,* 606 F.3d at 608–10.

First, Respondent contends that *Hayward* precludes relief under AEDPA because the *Hayward* court found that there is no clearly established Supreme Court law which mandates compliance with the "some evidence" standard. (Resp't Supp. Br. at 2.) The *Hayward* court never held that the Supreme Court required that the "some evidence" standard "be applied in all states regardless of state law." *Pearson,* 606 F.3d at 610–11. Rather, *Hayward* observed that California law gives rise to a liberty interest that may be enforced as a matter of federal law. *See id.* at 609 ("The principle that state law gives rise to liberty interests that may be enforced as a matter of federal law is long-established."); *see also Wilkinson v. Austin,* 545 U.S. 209, 221, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005). Contrary to Respondent's contention, *Hayward* not only announced that AEDPA applies to a review of the "some evidence" standard but also

applied AEDPA to the case before it and determined that there was indeed "some evidence" to support the Governor's reversal of the Board's grant of parole to Hayward. *Pearson*, 606 F.3d at 609.

Respondent next contends that, because the "some evidence" rule for parole denials is not a right that arises under federal law, *Hayward* establishes that there is no federal right to a "some evidence" review. (Resp't Supp. Br. at 2.) Although *Hayward* recognized that any right to release on parole arises from state, rather than federal law, *Hayward* and *Pearson* nevertheless hold that because there is a state-created liberty interest in parole, compliance with the state "some evidence" rule is protected under the Due Process Clause of the Fourteenth Amendment. *Hayward*, 603 F.3d at 561; *see also Pearson*, 606 F.3d at 611 ("Once a state creates [a parole system with an expectation of parole], it must operate the parole system in a manner that comports with due process.").

Respondent also contends that federal habeas corpus review is limited to a cursory determination of whether California's parole procedures are constitutionally adequate, and if so, whether the state in fact afforded Petitioner those procedures. (Resp't Supp. Br. at 2.) The Ninth Circuit has explicitly rejected this argument, explaining that "*Hayward* specifically commands federal courts to examine the reasonableness of the state court's application of the California 'some evidence' requirement, as well as the reasonableness of the state court's determination of the facts in light of the evidence ... that command can only be read as requiring an examination of *how* the state court applied the requirement." *Pearson*, 606 F.3d at 609 (emphasis in original). Additionally, the Ninth Circuit noted that the "some evidence" standard "imposes substantive rather than purely procedural constraints

on state officials' discretion to grant or deny parole: 'a reviewing court ... is not bound to affirm a parole decision merely because the Board or the Governor has adhered to all procedural safeguards.'" *Cooke v. Solis*, 606 F.3d 1206, 1213 (9th Cir.2010) (quoting *Lawrence*, 44 Cal.4th at 1210, 82 Cal.Rptr.3d 169, 190 P.3d 535).

■ The standard of review to be applied here is exactly what the courts in *Hayward*, *Pearson*, and *Cooke* announced. The Court must determine whether "the decision rejecting parole was an 'unreasonable application' of the California some evidence requirement or was 'based on an unreasonable determination of the facts in light of the evidence.'" *Hayward*, 603 F.3d at 563; *Pearson*, 606 F.3d at 611; *Cooke*, 606 F.3d at 1213.

### III. Analysis

■ Applying these standards to Petitioner's case, I conclude that the California appellate courts based their decision upholding the Governor's parole reversal on an unreasonable determination of the facts in light of the evidence presented. Both the California Court of Appeal and the Governor focused on factors which either failed to provide a rational nexus predictive of current dangerousness or which were factually incorrect. The Governor relied on an erroneous finding that Petitioner had not sufficiently accepted responsibility or demonstrated remorse for the commitment offense because he offered inconsistent versions of events, while the court of appeal relied on an erroneous finding regarding Petitioner's prison disciplinary history. Upon examination of the record, both findings were unreasonable determinations of the facts in light of the evidence.

### A. Commitment Offense

The Governor based his reversal of the Board's grant of parole in part on the

gravity of the underlying offense. The Governor characterized the crime as particularly egregious because it involved multiple victims. The Governor stated that the gravity of the first-degree murder was alone sufficient for him to conclude that Petitioner would pose an unreasonable risk to public safety. (Ex. A to Pet. at 2.)

■ However, the California Court of Appeal correctly determined that under California law, the immutable and unchangeable circumstances of the commitment offense alone do not constitute "some evidence" to support a decision denying parole. *Lawrence*, 44 Cal.4th at 1227, 82 Cal.Rptr.3d 169, 190 P.3d 535; *Shaputis*, 44 Cal.4th at 1259, 82 Cal.Rptr.3d 213, 190 P.3d 573. The court of appeal relied on *Shaputis* in finding that "the circumstances of the commitment offense are not sufficient to justify a decision to deny parole unless the circumstances, when considered in light of the other facts in the record, demonstrate the inmate is currently dangerous." (Lodgment 9 at 12.) Accordingly, the court of appeal correctly applied the "some evidence" test in determining that Petitioner's commitment offense alone was insufficient to demonstrate current dangerousness.

## B. Inconsistent Versions of Events

■ The only other factor relied upon by the Governor for his reversal of the Board was that Petitioner had not demonstrated sufficient remorse and acceptance of responsibility for the commitment crime because he gave inconsistent versions of his level of participation. (Ex. A to Pet. at 2.) The Governor first noted that Petitioner claimed, in preparation for the 2006 hearing, that he did not have a gun at the time of the murder, and that he did not shoot Mr. Tecomulapa. (*Id.*) The Governor stated that, contrary to Petitioner's

claim, the California Court of Appeal, on direct review of Petitioner's criminal conviction, noted that the sentencing court "emphatically stated it had no doubt [Petitioner] personally fired the fatal shots, based upon his review of the probation report and after listening to the testimony (and cross-examination) of [Petitioner]...."

The Governor also found that there was other evidence in the record which suggested that Petitioner may not have accepted responsibility for the crime:

For example, he claims, according to the 2006 Life Prisoner Evaluation, that he told his crime partners it was a bad idea to rob workers because most of them send money to families in Mexico. Mr. Haugen claims he instead suggested that they "ask the immigrants if any of them would like to be transported north of the San Clemente checkpoint," and he suggested that they charge a fee for the transportation. He told his 1997 mental-health evaluator that they should charge $250 per person. He also said, according to the 2006 Life Prisoner Evaluation, that they brought the guns for "self-protection." But as the 1994 Board noted, Mr. Haugen's version of the crime "doesn't make sense." If, as Mr. Haugen claims, the farm workers sent their money to families in Mexico, then it is unclear how they would pay the $250 transportation fee. Moreover, according to the December 11, 1980 San Diego County Sheriff's report, Mr. Haugen and his two crime partners drove to the ranch in a 1977 two-door Honda CVC, a car which Mr. Haugen admitted to the 1994 Board was "a real small hatchback type." And as the 1995 Board stated: so out of the clear blue three guys show up wearing ski masks armed with guns and they're asking these people, these victims, whether or

not they want to ride to Los Angeles." The Board added, "[d]oes that make sense to you?"

(Pet.'s Ex. A at 2–3.)

Here, the Governor's conclusion that Petitioner had not sufficiently expressed remorse because he gave inconsistent versions of the crime was an unreasonable determination of the facts in light of the evidence. A review of the record shows that Petitioner has from the start admitted his involvement in the crime, pleading guilty to first degree murder. And, Petitioner has persisted in his claim that he was not one of the shooters since the crime was committed.

■ During the 2006 parole hearing, the Board did not comment upon the alleged inconsistencies in Petitioner's statements regarding the details of the crime as it had done in the 1994 and 1995 parole hearings. Moreover, it was improper for the Governor to find Petitioner unsuitable for parole because he refused to admit that he was one of the shooters. *See* Cal. Penal Code § 5011(b); Cal. Code Regs., tit. 15, § 2236 (providing that the Board may not require an admission of guilt to any crime for which an inmate was committed when setting a parole date); *see also In re Palermo*, 171 Cal.App.4th 1096, 1110, 90 Cal. Rptr.3d 101 (2009) (holding that Board failed to articulate "some evidence" of dangerousness where defendant's continuing insistence that fatal shooting was the unintentional result of foolish conduct was not necessarily inconsistent with the evidence and he had accepted full responsibility for his crime and expressed complete remorse).[5]

In addition, while emphasizing the alleged inconsistencies in Petitioner's versions of events in order to support a finding that Petitioner was not sufficiently remorseful, the Governor completely omitted any mention of the facts which demonstrate Petitioner's acceptance of responsibility and remorse. Petitioner acknowledges that statements he made about the level of his involvement in the crime in 1994 and 1997 are inconsistent with statements made in 2006. (Pet.'s Reply Brief at 17.) However, he asserts that there is no evidence that he has ever denied responsibility for participating in the crime. (*Id.*) He also asserts that he has repeatedly and sincerely expressed remorse for the death of the victim. (*Id.*) During his closing remarks at the 2006 parole hearing, Petitioner stated, "I would never even say it was anything other than a cowardly act. It was and it's despicable and it's something that I—that it's just terrible, deep down inside what happened to [the victim]. It's what I use to keep me on the right track. And for me to try to make excuses or try to say that look, I'm not the guy who pulled the trigger and took [the victim's] life, you know what, it doesn't make any difference. You know, in reality, the fact of the matter is I'm responsible in my heart for the death of [the victim]. It doesn't matter—It doesn't matter what my crime partner did." (Lodgment 9 at 13.)

In addition, other evidence undermines the Governor's conclusion that Petitioner has failed to sufficiently demonstrate remorse for the commitment offense. For example, the Board concluded in 2006 that Petitioner had shown remorse, understood the magnitude of the offense and accepted responsibility for the crime. (Pet.'s Ex. B

5. To the extent that the Governor relied on court of appeal's statement that the trial court believed that Petitioner was one of the shooters, the underlying facts supporting the trial court's conclusions are not in the record. It cannot be said that this is a reasonable determination of the facts in light of the evidence presented.

at 54.) The presiding judge in Petitioner's criminal trial submitted a letter of support for Petitioner to the Board, noting that Petitioner "pled guilty prior to his preliminary hearing at the earliest opportunity to take responsibility for his actions and to demonstrate his remorse." (Ex. L to Pet. at 1.) Even the court of appeal conceded that Petitioner's remarks at the parole hearing in 2006 about his acceptance of responsibility for the crime are "apparently sincere." (Lodgment 9 at 13.)

Thus, there is no evidence in the record to show that Petitioner has recently downplayed the commitment offense or minimized his responsibility in any way. Whether Petitioner minimized his participation in the crime in some other way ten years before the parole hearing date does not provide "some evidence" that Petitioner is currently dangerous, particularly in light of Petitioner's assumption of responsibility for the commitment offense. Nor did the Governor provide any nexus between Petitioner's earlier inconsistent versions of events and his current risk of danger to the public if released on parole. Accordingly, the Governor's determination that Petitioner had not demonstrated remorse nor accepted responsibility for the crime was an unreasonable determination of the facts in light of the evidence.

## C. Prison Disciplinary History

■ Although it appears that the Governor did not rely upon Petitioner's prison disciplinary history in reversing the Board's grant of parole, the court of appeal relied upon it as a factor in affirming the

Governor's reversal. Petitioner received seven Form 115 disciplinary actions and seven Form 128 "chronos" during his more than 26 years of incarceration.[6] The most recent Form 115 discipline report occurred in 2001 for use of a prison work computer for personal business without authorization and the last Form 128 chrono occurred in 1998. (Lodgment 9 at 7; Ex. B to Pet. at 39.) The Board noted that none of the Form 115 disciplinary actions were for "force, violence, weapons or escapes." (Ex. B to Pet. at 39.)

The court of appeal concluded that Petitioner's prison disciplinary history, specifically the violations for unauthorized use of a computer, theft, and hotwiring, constituted "some evidence" that he was currently dangerous:

> While none of Haugen's prison disciplinary actions involved violent behavior, many of them, including his most recent disciplinary action in 2001 for unauthorized use of a prison computer, involve Haugen taking or using things without entitlement. Analogous behavior led to the commitment offense and most of Haugen's other crimes. Haugen's continued engagement in this type of behavior 20 years after his incarceration, coupled with the inconsistencies in his versions of events tends to show Haugen has not committed to ending his previous pattern of antisocial behavior, and, therefore, provides ample evidence to support the Governor's conclusion Haugen is currently dangerous and his re-

---

6. The California Department of Corrections and Rehabilitation uses Form 115 to report prisoners' rule violations. *See Lira v. Herrera,* 427 F.3d 1164, 1167 n. 4 (9th Cir.2005). The Department uses counseling "chronos" on Form 128 to record instances of minor misconduct. *See* Cal. Code Regs., tit. 15, § 3312(a)(2).

Petitioner's Form 115 disciplinary reports were for using his prison work computer for personal business without authorization, theft, hotwiring, treating staff disrespectfully, engaging in disruptive behavior, failing to follow telephone protocol, and failing to report to work. (Lodgment 9 at 7.)

lease would pose an unreasonable public safety risk.

(Lodgment 9 at 14–15.)

The appellate court's reliance on Petitioner's prison disciplinary history was an unreasonable determination of the facts in light of the evidence. As pointed out in the dissent by Justice McDonald, "none of the referenced offenses involved violent conduct." (Lodgment 9 at 20). In addition, the most recent "serious" offense occurred in 2001. The Court cannot find any rational nexus between Petitioner's unauthorized use of a work computer five years before his 2006 parole hearing and any current risk of danger to the public if released on parole.

The Ninth Circuit has held that "[w]hen habeas courts review the 'some evidence' requirement in California parole cases, both the subsidiary findings and the ultimate finding of some evidence constitute factual findings." *Cooke,* 606 F.3d at 1216. Here, there was no evidence that reasonably supported either the necessary subsidiary findings or the ultimate finding of current dangerousness. The decision of the California courts upholding the Governor's denial of parole was " 'based on an unreasonable determination of the facts in light of the evidence.' " *Hayward,* 603 F.3d at 563. Petitioner is therefore entitled to habeas corpus relief.

## IV. The Petition Is Not Moot

 Respondent contends that the petition is moot because Petitioner has been released on parole. (Resp't Supp. Brief at 9.) A case becomes moot when it no longer satisfies the case-or-controversy requirement of Article III, section 2, of the Constitution. *Spencer v. Kemna,* 523 U.S. 1, 7, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998). To avoid dismissal on mootness grounds, the Court must determine that the habeas petitioner continues to have a "personal

stake in the outcome of the lawsuit." *United States v. Verdin,* 243 F.3d 1174, 1177 (9th Cir.2001). "This means that . . . the plaintiff 'must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision.' " *Spencer,* 523 U.S. at 7, 118 S.Ct. 978 (quoting *Lewis v. Cont'l Bank Corp.,* 494 U.S. 472, 477, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990)). Under California law, "an inmate-turned-parolee remains in the legal custody of the California Department of Corrections through the remainder of his term, and must comply with all of the terms and conditions of parole, including mandatory drug tests, restrictions on association with felons or gang members, and mandatory meetings with parole officers." *Samson v. California,* 547 U.S. 843, 851, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006). The restrictions imposed on a parolee constitute a concrete injury for purposes of the mootness analysis. *Spencer,* 523 U.S. at 7–8, 118 S.Ct. 978. Therefore, release on parole does not necessarily moot a habeas challenge to a parole denial.

Where, as here, a petitioner has subsequently been released to a determinate period of parole supervision, federal courts have found that the petitioner, should he prevail, may still obtain an order from the district court directing California authorities to credit him with the time served in prison in violation of his constitutional rights towards his determinate period of parole supervision. *See McQuillion v. Duncan,* 342 F.3d 1012, 1015 (9th Cir.2003) (noting that the appropriate remedy was immediate release without parole supervision where petitioner's parole supervision period would have elapsed but for the constitutional violation); *see also Cowans v. Hartley,* 2010 WL 582104, *3 (E.D.Cal., Feb. 11, 2010); *Carlin v. Wong,* 2008 WL 3183163, *2 (N.D.Cal., Aug. 4 2008) ("Here, petitioner is entitled to credit against his parole period for his time in confinement

that was in violation of his due process rights.").

Petitioner was sentenced in 1981 to a term of twenty-five years to life for a first degree felony murder conviction. As of May 10, 2010, Petitioner was released on parole supervision for a period of five years. California Penal Code § 3000.1, which imposes a lifetime parole term for "any inmate sentenced ... for any offense of first or second degree murder with a maximum term of life imprisonment," does not apply to Petitioner because his crime was committed prior to January 1, 1983, the effective date of § 3000.1. *See In re Chaudhary*, 172 Cal.App.4th 32, 34, 90 Cal. Rptr.3d 678 (2009) (noting that § 3000.1 applies to crimes committed after January 1, 1983).

Accordingly, the Court finds that the actual surplus time that Petitioner has been incarcerated beyond his parole date should be credited toward his post-release parole period. *See McQuillion*, 342 F.3d at 1015. Had Petitioner's due process rights not been violated by the Governor's reversal of parole on March 27, 2007, Petitioner would have been released, at the earliest, when the parole suitability determination became final on February 28, 2007, 120 days after the date of the parole hearing. Thus, the Court finds that the time Petitioner was incarcerated beyond the date mandated by the Board's decision should be credited toward his post-release parole period.

## V. Conclusion

For the reasons stated above, it is respectfully recommended that the petition for writ of habeas corpus be **GRANTED** under the terms discussed above.

Dated: July 13, 2010