**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

KENNETH PEARSON,
                *Petitioner-Appellee,*

v.

MADELENE A. MUNTZ, Acting
Warden,
                *Respondent-Appellant.*

No. 08-55728

D.C. No.
2:05-cv-06937-
SGL-OP

OPINION

Appeal from the United States District Court
for the Central District of California
Stephen G. Larson, District Judge, Presiding

Argued and Submitted
January 7, 2011—Pasadena, California

Filed April 5, 2011

Before: Stephen Reinhardt, Marsha S. Berzon, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Berzon

## COUNSEL

Marc Grossman, Law Offices of Marc E. Grossman, Upland, California, for the petitioner-appellee.

Julie L. Garland, Senior Assistant Attorney General, San Diego, California, and Amy M. Roebuck, Deputy Attorney General, San Diego, California, for the respondent-appellant.

## OPINION

BERZON, Circuit Judge:

Madelene A. Muntz, the Acting Warden of Chuckawalla Valley State Prison (hereinafter referred to as "the State"),

appeals the district court's decision granting Appellee Kenneth Pearson's petition for a writ of habeas corpus under 28 U.S.C. § 2254. The district court held that the Governor's reversal of the decision of the Board of Prison Terms[1] ("the Board") to grant Pearson parole was not supported by "some evidence" that Pearson would be a danger to public safety if paroled. We have jurisdiction over the State's appeal pursuant to 28 U.S.C. § 2253(a) and, in light of *Swarthout v. Cooke*, 131 S. Ct. 859 (2011) (per curiam), we reverse.

# I.

Under California law,[2] prisoners like Pearson serving indeterminate life prison sentences (i.e., those whose life sentences do not include "without possibility of parole") "may serve up to life in prison, but they become eligible for parole consideration after serving minimum terms of confinement." *In re Dannenberg*, 34 Cal. 4th 1061, 1078 (2005); *see also* Cal. Penal Code § 3046(a); Cal. Code Regs. tit. 15 §§ 2000(b)(3), (b)(67). A year before the prisoner's "minimum eligible parole date," the Board is required to convene a panel to consider whether to release the prisoner on parole and, if so, when. Cal. Penal Code § 3041(a).

---

[1]Since July 1, 2005, the Board has been known as the Board of Parole Hearings, but its relevant functions have not changed. *See In re Olson*, 149 Cal. App. 4th 790, 793 n.1 (2007).

[2]In November 2008, California voters passed Proposition 9, the "Victims' Bill of Rights Act of 2008: Marsy's Law," which changed numerous aspects of California's parole system, including the availability and frequency of parole hearings for prisoners not initially found suitable for parole. *See Gilman v. Davis*, 690 F. Supp. 2d 1105, 1128 (E.D. Cal. 2010) (granting a preliminary injunction enjoining the enforcement of certain portions of Proposition 9 as to the named plaintiffs on the basis of their Ex Post Facto challenge), *rev'd sub. nom.*, *Gilman v. Schwarzenegger*, ___ F.3d ___, 2011 WL 198435 (9th Cir. 2011). Because Pearson's parole suitability hearing occurred well before the passage of Proposition 9, the changes it made to the California parole system are irrelevant for purposes of this appeal.

At its meeting, the Board first considers whether the inmate is "suitable" for parole release. *Id.* §§ 3041(b), 3041.5(a)(6). California law provides that the Board "shall set a release date unless . . . consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." *Id.* § 3041(b). In making this suitability determination, "the fundamental consideration . . . is public safety . . . [which] involves an assessment of an inmate's *current* dangerousness." *In re Lawrence*, 44 Cal. 4th 1181, 1205 (2008). Regulations promulgated by the Board provide that "[a]ll relevant, reliable information available to the panel shall be considered in determining suitability for parole," including various enumerated "circumstances." Cal. Code Regs. tit. 15 § 2281(b). The regulations specify a number of "circumstances" that "tend to show that the prisoner is suitable for release," *id.* § 2281(d), and others that "tend to indicate unsuitability for release," *id.* § 2281(c). The California Supreme Court has emphasized that the factors set forth in the regulations are not the ultimate touchstone of the Board's inquiry; rather, the regulations are "designed to guide the Board's assessment of whether the inmate poses 'an unreasonable risk of danger to society if released from prison,' and thus whether he or she is suitable for parole." *Lawrence*, 44 Cal. 4th at 1202 (quoting Cal. Code Regs. tit. 15 § 2281(a)); *see also In re Shaputis*, 44 Cal. 4th 1241, 1254 (2008) ("[B]ecause the paramount consideration for both the Board and the Governor under the governing statutes is whether the inmate currently poses a threat to public safety, and because the inmate's due process interest in parole mandates a meaningful review of a denial-of-parole decision, the proper articulation of the standard of review is whether there exists 'some evidence' that an inmate poses a current threat to public safety, rather than merely some evidence of the existence of a statutory unsuitability factor.").

As part of the parole suitability determination, the Board is required to hold a hearing, which the prisoner has the right to attend, "to ask and answer questions, and to speak on his or

her own behalf." Cal. Code Regs. tit. 15 § 3041.5(a). If the Board finds the inmate unsuitable for parole, it provides him or her "a written statement setting forth the reason or reasons for refusal to set a parole date, and suggest[s] activities in which [the inmate] might participate that will benefit him or her while he or she is incarcerated." *Id.* § 3041.5(b)(2). It also schedules the next parole suitability hearing. *Id.* § 3041.5(b)(3).

If, on the other hand, the Board determines that the inmate is suitable for parole, it proceeds to set a release date by calculating the prisoner's "base term." Cal. Code Regs. tit. 15 § 2282(a). Unlike the parole suitability determination, the base term is established "solely on the gravity of the base offense, taking into account all of the circumstances of that crime." *Id.*; *see also In re Bush*, 161 Cal. App. 4th 133, 142 (2008) ("[T]he base term reflects an appropriate sentence for the crime when compared to other comparable offenses."). The Board has published matrices enumerating base terms for various offenses, *see* Cal. Code Regs. tit. 15 §§ 2282-89, from which the Board can depart in a particular inmate's case if warranted by one or more enumerated factors, *see id.* § 2404. If the time the prisoner has already served exceeds the term the Board calculates, the Board designates the prisoner for release;[3] if the reverse is true, the Board sets a release date that falls after the completion of the calculated term. *See* Bush, 161 Cal. App. 4th at 142.

---

[3]Because the parole suitability determination and the prison term calculation are directed at different factors, a prisoner may end up serving years more than the term calculated by the Board once he is found suitable for parole. *See Bush*, 161 Cal. App. 4th at 142. In other words, though consideration of only the base offense might suggest an appropriate prison term of *X* years, characteristics unique to the inmate properly considered in the parole suitability determination (such as past criminal record, prison disciplinary record, plans for parole, etc.) may lead the Board to conclude that he is not "suitable" for parole until he has served more than *X* years.

If the inmate was "sentenced to an indeterminate term upon conviction of murder," the Governor may reverse or modify the Board's parole decision, Cal. Const. Art. V § 8(b); *see also* Cal. Penal Code § 3041.2, though he may do so only "on the basis of the same factors which the parole authority is required to consider." Cal. Const. Art. V § 8(b); *see also In re Rosenkrantz*, 29 Cal. 4th 616, 663-64 (2002).

For prisoners convicted of most crimes, the term of parole is a set number of years (ranging up to 20 years), *see* Cal. Penal Code § 3000(b)(1)-(4), although it can be discharged early under certain circumstances, *see id.* § 3001(a)-(c). In the case of inmates sentenced to a maximum term of life imprisonment for first or second degree murder, however, the period of parole (if parole is granted) is "the remainder of the inmate's life." *Id.* § 3000.1(a)(1). But here again, parole can be discharged early: The relevant statute provides that once an individual convicted for second degree murder who was sentenced to an indeterminate life sentence has been on parole for five continuous years (or seven years for someone convicted of first degree murder), "the [B]oard shall . . . discharge that person from parole, unless the [B]oard, for good cause, determines that the person will be retained on parole." *Id.* § 3000.1(b). If a parolee is retained on parole pursuant to this process, he is entitled to a new parole discharge review "each year thereafter." *Id.* § 3000.1(c).

## II.

On October 6, 1985, Pearson, 21 years-old at the time, exchanged gunfire with a crowd of rival gang members while riding in a car being driven by his best friend and fellow member of the East Coast Crips, Lamont Grant. One of Pearson's shots struck a member of the rival gang, paralyzing him, while a shot fired by an unknown individual hit Grant in the head, killing him. Pearson fled the scene on foot, but was arrested the next day. He ultimately pled guilty to second-

degree murder for Grant's death and was sentenced to 15 years to life in prison.

Pearson had six parole suitability hearings between 1993 and 2001, all of which found him unsuitable for parole. The Board granted Pearson parole at the conclusion of his seventh parole hearing, held in June 2002, but Governor Gray Davis reversed the Board's decision. Pearson's eighth parole suitability hearing, which forms the basis of this appeal, was held on November 19, 2003. The Board again found Pearson suitable for parole, highlighting several factors as indicating that Pearson "is suitable for parole and would not pose an unreasonable risk of danger to society or a threat to public safety if released from prison," including significant vocational prospects; an "extremely limited" prison disciplinary record; signs of remorse; significant family ties; and a psychological report indicating that if released to the community, Pearson's propensity for violence "would be no greater than the average citizen." In accordance with Cal. Code Regs. tit. 15 §§ 2282(a) and 2403(c), the Board set a tentative release date and imposed several special conditions of parole.

Governor Schwarzenegger reversed the Board in a decision dated April 14, 2004. The Governor gave three reasons for his decision: that Pearson had not demonstrated sufficient remorse for his actions; that his post-prison plans were not realistic—in particular, his plan to live with either his aunt or mother, both of whom live relatively close to Pearson's "old gang-infested neighborhood"; and that the commitment offense demonstrated a callous disregard for human suffering.

Pearson immediately filed a petition for habeas corpus in California Superior Court, which was denied on December 15, 2004. The Superior Court rejected the Governor's first two proffered reasons for denying Pearson parole, but held that "[t]here is . . . 'some evidence' [that] Petitioner is unsuitable for parole based on the circumstances of the commitment offense." On appeal, the California Court of Appeal affirmed

in a one-paragraph order. Pearson's petition for review to the California Supreme Court was summarily denied on June 8, 2005, with two Justices dissenting.

Three months later, Pearson filed a habeas petition in federal district court under 28 U.S.C. § 2254, arguing that the Governor's decision had violated his right to due process under the Fourteenth Amendment by denying him parole despite the absence of "some evidence" that he would be a threat to public safety. Magistrate Judge Parada issued a Report and Recommendation on July 3, 2007, holding that in light of the other record evidence, "the commitment offense is no longer reliable evidence of [Pearson's] unsuitability for parole." Magistrate Judge Parada therefore recommended that Pearson's petition be granted. The Report and Recommendation was subsequently adopted by District Judge Larson. Judge Larson ordered that Pearson be released within 30 days of the entry of judgment, but granted the State a temporary stay to allow it to seek a stay from this Court pending its appeal on the merits.

**[1]** The State filed a timely notice of appeal on April 29, 2008, followed three weeks later by an emergency motion for a stay. On June 3, 2008, the State was granted a stay pending the resolution of *Hayward v. Marshall*, a case that was taken en banc to decide, *inter alia*, "whether federal constitutional law imposes on the states a requirement for some quantum of evidence to support a state's denial of parole," and, "even if there is no general federal quantum of evidence requirement," whether "applicants for parole in California . . . may obtain federal habeas review of whether there is 'some evidence' supporting a negative parole decision." 603 F.3d 546, 549 (9th Cir. 2010) (en banc).

*Hayward* ultimately declined to answer the first question, reasoning that:

> Because the California "some evidence" standard is
> exactly the same as the one Hayward urges as a fed-

eral constitutional standard, the doctrine of constitutional avoidance counsels not deciding whether the California parole scheme establishes a predicate for imposing it as a matter of federal constitutional law. State law already does what Hayward would have federal constitutional law do. We therefore do not decide whether a right arises in California under the United States Constitution to parole in the absence of some evidence of future dangerousness.

*Id.* at 562 (footnote omitted). As to the latter question, however, *Hayward* answered in the affirmative, holding that courts in this circuit should evaluate whether a particular inmate's parole denial was "an 'unreasonable application' of the California 'some evidence' requirement, or was 'based on an unreasonable determination of the facts in light of the evidence.' " *Id.* at 563 (quoting 28 U.S.C. § 2254(d)(1)-(2)).

**[2]** Following the en banc decision in *Hayward*, we issued an order dissolving the stay in this case.[4] Approximately a week later, the State filed an emergency motion for reconsideration, which we denied in a published order on May 24, 2010. *Pearson v. Muntz*, 625 F.3d 539 (9th Cir. 2010) (per curiam). The State argued that because Pearson's right to parole is created by state law, his parole denial cannot be reviewed by way of a federal habeas petition. We disagreed, pointing out that *Hayward* permitted the very review that the State argued it prohibited. *See id.* at 547-49. We explained, moreover, that "[i]n California, the 'some evidence' requirement is a component of [the] liberty interest" in parole that is protected by federal procedural due process. *Id.* at 439.

---

[4]Several months later, Pearson was granted parole on the basis of a more recent decision of the Board. Pearson argues, on the basis of *McQuillion v. Duncan*, 342 F.3d 1012, 1014 (9th Cir. 2003), that he could still be afforded relief in this case—namely, a reduction of his term of parole equal to the amount of time he was unconstitutionally imprisoned. Given our holding, we do not reach the question.

**[3]** A few months later, however, the Supreme Court issued a per curiam decision in *Cooke*, 131 S. Ct. 859. *Cooke* did not disturb our precedent that "California law creates a liberty interest in parole." *Id.* at 861. But it held that, under the Fourteenth Amendment's Due Process Clause, the protections to which a California inmate is entitled prior to a denial of parole do not include a showing of some evidence of future dangerousness. *Id.* While the Court did not define the minimum process required by the Due Process Clause for a denial of parole under the California system, it made clear that the Clause's requirements were satisfied where the inmates "were allowed to speak at their parole hearings and to contest the evidence against them, were afforded access to their records in advance, and were notified as to the reasons why parole was denied." *Id.* at 862.

## III.

**[4]** Pearson has never argued that he was denied an opportunity to speak at his hearing and contest the evidence against him, that he was denied access to his record in advance, or that he was not notified of the reasons why parole was denied.[5] His complaint has been all along that there was not "some evidence" of future dangerousness in his case, resulting in a violation of his rights to due process guaranteed by the Constitution. *Cooke* makes clear that we cannot consider whether "some evidence" of dangerousness supported a denial of parole on a petition filed under 28 U.S.C. § 2254.

Nonetheless, Pearson argues that *Cooke* "does not affect the resolution of this case" because it did not decide "whether

---

[5]Following *Cooke*'s issuance, Pearson did argue for the first time, in a letter filed pursuant to Rule 28(j) of the Federal Rules of Appellate procedure, that the Governor's decision to deny him parole violated due process because the Governor did not afford Pearson a hearing before making his decision. As this argument comes too late, the issue is not properly before us. *See United States v. Gomez-Mendez*, 486 F.3d 599, 606 n.10 (9th Cir. 2007).

a right arises in California under the United States Constitution to parole in the absence of some evidence of future danger." In other words, Pearson argues that *Cooke*, like *Hayward*, did not decide whether the Constitution imposes on the states a requirement that its decisions to deny parole be supported by a particular quantum of evidence, independent of any requirement imposed by state law.

**[5]** We disagree. *Cooke* was unequivocal in holding that if an inmate seeking parole receives an opportunity to be heard, a notification of the reasons as to denial of parole, and access to their records in advance, "[t]hat should . . . be[ ] the beginning and the end of [the] inquiry into whether [the inmate] received due process." *Id.* at 862. To reiterate, Pearson has not questioned whether those procedures were provided, and therefore, after *Cooke*, our inquiry is at its end.

The district court's decision to grant Pearson's petition must be **REVERSED**.